**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE ELEVANCE HEALTH COMPANIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> HAMASPIK, INC., ESTHER ELEFANT, ADAM KOEGEL, VLADAMIR ROBU, and YARITZA CASTILLO, <br><br> Defendants. | CASE NO. 1:26-cv-06361 <br><br><br> **JURY TRIAL DEMANDED** |

**VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

**INTRODUCTION**

This case involves a coordinated scheme by Defendant Hamaspik, Inc. ("Hamaspik") to build and expand its managed care operations in New York through the unlawful recruitment of Plaintiff The Elevance Health Companies, Inc.'s ("Elevance Health") employees. Hamaspik's systematic recruitment of key Elevance Health personnel, some of whom are subject to contractual obligations that prohibit their employment at a competitor, is allowing Hamaspik to obtain the benefit of confidential information, trade secrets, and know-how that Elevance Health spent years and millions of dollars developing. Hamaspik's intent is unmistakable: to recreate, at a fraction of the cost, the managed care infrastructure, expertise, and competitive advantages that Elevance Health acquired in 2024 when it purchased Centers Plan for Healthy Living LLC and Care Solutions (together, "Centers").

Beginning in December 2025 and continuing to date, Hamaspik has recruited no less than seven (7) Elevance Health employees across multiple operational functions. These employees

1

collectively oversaw the operational, administrative, network, and sales functions of Elevance Health's New York Managed Long-Term Care ("MLTC") and Fully Integrated Dual Eligible Special Needs Plan ("FIDE") plans. And some of these employees, named as Defendants, are not departing innocently. Before resigning, Defendant Esther Elefant emailed hundreds of pages of Elevance Health's confidential, proprietary, and trade secret information to a personal email account. Among other things, she sent materials reflecting the systems, strategies, and methodologies that distinguished Elevance Health's FIDE operations. Ms. Elefant is not alone in committing such wrongdoing for Hamaspik's benefit. Defendants Robu and Castillo did the same thing. There is no legitimate reason for these individuals to have taken this information other than to use it in their new roles at Hamaspik, and, on information and belief, Hamaspik is knowingly accepting, using, and benefiting from this misappropriated information.

Through its coordinated effort, Hamaspik is systematically trying to deplete Elevance Health of the core individuals who oversee its New York MLTC and FIDE plans, positioning itself to replicate a large-scale turnkey FIDE operation with the knowledge, experience, and confidential business information Elevance Health spent years and substantial resources acquiring. This is not ordinary competition—it is a calculated scheme to misappropriate Elevance Health's proprietary business assets, trade secrets, and institutional knowledge to gain a competitive advantage through unlawful means.

Accordingly, Elevance Health brings this action with urgency to: (1) stop Hamaspik's unlawful raiding of Elevance Health employees, some of whom are   bound by contractual obligations preventing them from working for Hamaspik in a competitive capacity; (2) stop Defendants' further misappropriation of Elevance Health's trade secrets and confidential information; (3) enforce its contractual rights and obtain monetary relief for their breach; (4) halt

the ongoing and irreparable harm caused by Defendants' misconduct; and (5) recover monetary damages sufficient to compensate Elevance Health for the harm Defendants' misconduct has caused.

## PARTIES

1.      Plaintiff Elevance Health is a New York registered foreign corporation organized under the laws of the State of Indiana with its principal place of business at 220 Virginia Avenue, Indianapolis, Indiana 46204.

2.      Defendant Hamaspik is a domestic corporation organized under the laws of the State of New York with a principal place of business at 58 Route 59, Suite 1, Monsey, NY 10952. Hamaspik is a community-based managed care organization and, on information and belief, owns various not-for-profit corporations including, Hamaspik Care, Inc., Hamaspik Choice, Inc., Hamaspik of Kings County, Inc., Hamaspik of Orange County, Inc., Hamaspik of Rockland County, Inc., and Hamaspik Select, Inc. Each of these not-for-profit corporations are also organized under the laws of New York with a principal place of business at 58 Route 59, Suite 1, Monsey, NY 10952.

3.      Defendant Esther Elefant ("Ms. Elefant") is a citizen of New Jersey who resides at 39 Knightbridge Pl., Jackson, New Jersey 08527. Elevance Health formerly employed Ms. Elefant as Director II, Healthcare Management Services, assigned to Elevance Health's New York office at 28 Liberty Street, New York, New York.

4.      Defendant Adam Koegel ("Mr. Koegel") is a citizen of New York who resides at 404 Cedarhurst Avenue, Cedarhurst, New York 11516. Elevance Health formerly employed Mr. Koegel as Director II, Claims, assigned to Elevance Health's New York office at 28 Liberty Street, New York, New York.

3

5.    Defendant Vladamir Robu ("Mr. Robu") is a citizen of New Jersey who resides at 3201 Central Ave, Aberdeen, New Jersey 07747. Elevance Health formerly employed Mr. Robu as a Manager Sales for Medicare products, assigned to Elevance Health's New York offices at 8 Liberty Street, New York, New York and 75 Vanderbilt Ave., Staten Island, New York 10304.

6.    Defendant Yaritza Castillo ("Ms. Castillo") is a citizen of New Jersey who resides at 107 11th Street, Hazlet, New Jersey 07730. Elevance Health formerly employed Ms. Castillo as Director of Network Support, offices at 8 Liberty Street, New York, New York and 75 Vanderbilt Ave., Staten Island, New York 10304.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Count V arises under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, a federal statute, and the Court has supplemental jurisdiction over the state-laws claim under 28 U.S.C. § 1367.

8.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs, as to each Defendant.

9.    Specifically, Elevance Health is a corporation organized under the laws of the State of Indiana with its principal place of business located at 220 Virginia Avenue Indianapolis, Indiana. It is therefore a citizen of Indiana.

10.    Defendant Hamaspik is a corporation organized under the laws of New York with its principal place of business located at 58 Route 59, Suite 1, Monsey, NY 10952. Hamaspik is therefore a citizen of New York.

11.    Defendant Koegel is a citizen of New York; Defendants Elefant, Robu, and Castillo are New Jersey citizens.

4

12.     The amount in controversy exceeds $75,000, exclusive of interest and costs, because Elevance Health's claims arise from the alleged misappropriation and exploitation of confidential information, trade secrets, and competitive assets developed in connection with its FIDE plan and related government healthcare operations—business lines representing millions of dollars in annual revenue and the product of substantial investments of capital, time, and expertise.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including the individual Defendants' performance of services for Elevance Health from within this District, the misappropriation of Elevance Health's confidential information and trade secrets within this District, and Defendants' competitive activities within this District.

14.     This Court has personal jurisdiction over Defendants Hamaspik and Koegel because each is a citizen of the State of New York, resides or conducts business within this District, and committed the acts giving rise to this action within this District.

15.     This Court has personal jurisdiction over Defendants Elefant, Robu, and Castillo because they performed services for Elevance Health in and directed at New York, their competitive employment at Hamaspik is directed at the New York managed care market, and their unlawful acts – including  improper solicitation of Elevance Health employees and threatened misappropriation of trade secrets – are directed at New York and causing injury in this District.

## FACTUAL BACKGROUND

### Elevance Health's Business

16.     Elevance Health is one of the nation's leading healthcare benefit companies with more than 40 million members enrolled in its affiliated health plans nationwide.

5

17.     Among its lines of business, Elevance Health operates Medicaid plans, including MLTC plans and FIDE plans, in the State of New York. Elevance Health's New York managed care operations serve tens of thousands of members, including some of the most medically complex and vulnerable populations in the state.

18.     The managed care industry is intensely competitive. The ability to attract and retain experienced talent, develop proprietary care management methodologies, build provider networks, and establish member engagement strategies represents a substantial competitive advantage. Elevance Health has invested millions of dollars over many years developing and acquiring the institutional knowledge, systems, processes, and relationships that underpin its New York managed care operations.

### Elevance Health's Confidential Information, Trade Secrets, and Confidentiality Obligations

19.     Elevance Health maintains extensive categories of confidential information and trade secrets relating to its managed care operations. These include, without limitation: proprietary care management protocols and methodologies; member engagement strategies and materials; staffing models and organizational structures; provider network configurations, rates, and contract terms; claims adjudication systems, workflows, and technical configurations; quality management approaches and Healthcare Effectiveness Data and Information Set ("HEDIS") improvement strategies; financial performance data and projections; strategic business plans and competitive analyses; and information regarding the strengths and weaknesses of current operations and systems.

20.     Elevance Health implements numerous measures to protect its confidential, trade secret, and proprietary information. These measures include requiring certain highly-compensated employees to agree to narrowly tailored post-employment restrictive covenants in exchange for

6

stock and/or stock rights; requiring that employees participate in internal training programs addressing the importance of Elevance Health's confidential and propriety information and safeguarding it; adopting a Code of Conduct and company-wide written policies, restricting the disclosure and/or use of confidential information other than for official company purposes; and housing confidential information on password-protected systems accessible only through unique credentials.

21.    In addition, all Elevance Health employees are subject to Elevance Health's Code of Conduct ("Code of Conduct") and Workplace Privacy and Confidentiality Policy ("Confidentiality Policy"), which provides, among other things:

> It is everyone's responsibility to help ensure our confidential and proprietary information is used only when authorized by policy and for valid business purposes. We are obligated to protect this information from improper use or disclosure even after our employment ends.

Code of Conduct, Exhibit A.

> You shall not disclose or use at any time, either during or after employment, any confidential or proprietary information of the company. You shall not attempt to acquire confidential or proprietary information beyond that which is reasonably necessary to perform the duties of your job. You shall not in any way gather such information for personal use, or use which conflicts with the best interests of the company.

Confidentiality Policy, Exhibit B.

22.    The Code of Conduct defines confidential and proprietary information as any information not shared with individuals outside of the Company and any information useful to competitors. Confidentiality Policy defines proprietary and confidential information to include, among other things: all files, records, data, work product, materials, software and programs; all financial information; information that could aid others to compete against the Company by

7

gaining an unfair advantage; trade secrets; information, ideas, corporate or regulatory development plans, and long-term strategies.

23.    The Confidentiality Policy provides that upon termination of employment, employees must return all Company property, including manuals, letters, notes, notebooks, reports, customer or prospect lists, data, information, or files.

24.    Elevance Health also stores and maintains its confidential information and trade secrets on its computer systems which employees can only access with unique passwords.

**<u>Elevance Health Acquires Centers</u>**

25.    Up until 2024, Centers was a New York-based managed care organization that operated a MLTC plan serving approximately 53,000 members in New York. Centers had a substantial operational infrastructure, including experienced management teams, proprietary care models, provider networks, and information technology systems, built over many years of operation.

26.    Effective December 31, 2024, Elevance Health acquired Centers for hundreds of millions of dollars in a negotiated arm's-length transaction. Through this acquisition, Elevance Health purchased not only the physical assets and MLTC plan contracts, but also the institutional knowledge, proprietary methodologies, and experienced workforce Centers had developed.

27.    Effective December 31, 2024, Centers employees became Elevance Health employees. As part of the transition, Elevance Health provided substantial benefits to many former Centers employees, including retention bonuses aimed at incenting employees to remain with Elevance Health to preserve continuity of operations.

28.    Since acquiring Centers, Elevance Health has invested millions of dollars in its New York managed care operations, including specific investments in technology systems, care

management programs, provider network development, quality improvement initiatives, and human capital development. Several former employees named as defendants in this lawsuit (and others anticipated to be named) were central to these ongoing investments and operational initiatives.

**Medicare Advantage, MLTC Plans, and FIDE Plans**

29.     Medicare Advantage is a federally funded program administered through contracts between the Centers for Medicare & Medicaid Services ("CMS") and private managed care organizations like Elevance Health.

30.     Managed care organizations that participate in Medicare Advantage receive capital payments from CMS to provide comprehensive healthcare services to enrolled beneficiaries. The quality and efficiency of a plan's care model directly impacts its CMS star ratings, which in turn impacts reimbursement rates, bonus payments, and the plan's ability to attract and retain members.

31.     Elevance Health manages and administers MLTC plans in New York, which provide services such as home health aides and nursing home care to elderly and disabled Medicaid members who require in-home support.

32.     A FIDE plan is a specialized type of Medicare Advantage Dual Eligible Special Needs Plan ("D-SNP") designed for individuals who qualify for both Medicare and Medicaid. FIDE plans provide all medical, prescription drug, behavioral health, and long-term care benefits through a single, integrated plan. FIDE plans eliminate fragmentation that typically characterizes care for dual eligible beneficiaries.

33.     Managed care organizations operating FIDE plans are generally responsible for:

   a. **Care management**, which includes developing and implementing comprehensive care models that address the full spectrum of member needs, assigning dedicated Care Managers, coordinating across medical, behavioral, and long-term care services, and ensuring seamless member experiences;

9

b. **Utilization management**, which includes ensuring services are medically necessary, monitoring resource utilization, and managing authorizations for services;

c. **Pharmacy care management**, which includes coordinating prescription drug benefits, managing formularies, and ensuring medication adherence;

d. **Quality assurance and HEDIS performance**, which includes monitoring health outcomes, tracking industry scoring criteria, and maintaining the clinical quality metrics required for CMS star ratings.

34. FIDE plans are difficult to establish and operate successfully. The complexity of integrating Medicare and Medicaid benefits, coordinating across multiple service providers, and achieving high CMS star ratings requires significant institutional knowledge, proprietary care model methodologies, and skilled personnel. These barriers to entry make the information and expertise required to build and operate a successful FIDE plan highly valuable.

35. Elevance Health's acquisition of Centers was a strategic investment in the New York MLTC plan space. It also provided a natural membership pipeline into Elevance Health's New York FIDE plan. MLTC plan members almost always become FIDE-eligible because they are covered under both Medicare and Medicaid. In other words, MLTC members "age into" FIDE eligibility; once a member becomes dual eligible, Elevance Health receives both Medicare and Medicaid revenue for that member.

36. Currently, Elevance Health has approximately 98,000 MLTC members in New York. Approximately 75% of those members are FIDE-eligible.

37. The State of New York is actively encouraging managed care organizations to move away from MLTC enrollment due to cost in favor of fully integrated plans like FIDE, which integrate services and create cost reductions. This regulatory trend makes FIDE plans even more valuable and the expertise to operate them more critical.

38.    On information and belief, Hamaspik, which already operates an MLTC plan in New York, is actively seeking to build out and expand its existing FIDE plan. To accomplish this, Hamaspik needs the very institutional knowledge, skilled personnel, and operational expertise Elevance Health acquired when it purchased Centers. Hence, the conduct complained of in this Verified Complaint.

**Hamaspik's Systematic Scheme to Poach Elevance Health Employees**

39.    Since late 2025, Hamaspik has engaged in a deliberate and systematic scheme to hire former Elevance Health employees for the purpose of gaining an unlawful competitive advantage in the administration of MLTC and FIDE plans in New York.

40.    To date, Hamaspik has hired at least seven (7) former Elevance Health/Centers employees, including those detailed below, each of whom now performs the same or substantially similar functions for Hamaspik as he or she performed for Elevance Health:

| Name | Elevance Title | Hamaspik Title | Departure |
|---|---|---|---|
| Esther Elefant | Director II, Healthcare Management Services | Upon information and belief, FIDE care management role | July 2, 2026 |
| Adam Koegel | Director II, Claims | Claims/operations role | May 29, 2026 |
| Chedva Fox | Director GBD Special Programs | Upon information and belief, FIDE team role | July 23, 2026 |
| Yaritza Castillo | Director, Network Support/Network Mgmt. | VP of Provider Relations and Contracting | April 13, 2026 |
| Junwen Zhang | Ratings/Claims System Analyst | Software Developer | April 10, 2026 |
| Vladamir Robu | Manager Sales | Director of Sales for Medicare | December 15, 2025 |
| Poyu Li | Manager II, Medical Management | Upon information and belief, FIDE team role. | July 2026 |

41.    Hamaspik is not merely hiring talented employees in the ordinary course. It is systematically hiring employees, some bound by post-employment restrictive covenants that

prohibit their working for Hamaspik (Defendants Elefant and Koegel), and others who knowingly misappropriated confidential information and trade secrets before departing (Defendants Elefant, Castillo, and Robu). On information and belief, therefore, Hamaspik is engaged in a deliberate campaign to acquire Elevance Health's institutional knowledge and trade secrets, information Hamaspik could not obtain on its own.

42.     Hamaspik's systematic poaching of Elevance Health employees is ongoing, and the full extent of the harm to Elevance Health has yet to be determined.

### Ms. Elefant and Mr. Koegel Join Elevance Health and Agrees to Post-Employment Restrictive Covenants

43.     Ms. Elefant became an employee of Elevance Health on December 31, 2024, upon the completion of Elevance Health's acquisition of Centers. Her annual salary was approximately $220,000, plus benefits, stock awards, and a retention bonus paid in connection with the acquisition.

44.     In recognition of the key role she played in the Centers integration, Elevance Health paid Ms. Elefant a retention bonus of $75,000. Exhibit C. In addition, due to Ms. Elefant's importance to its FIDE program, Elevance Health offered Ms. Elefant a second two-year retention agreement valued at $150,000. Exhibit D. She was to receive the first $100,000 installment on or about December 31, 2026.

45.     Mr. Koegel became an employee of Elevance Health on or about December 31, 2024, upon the completion of Elevance Health's acquisition of Centers. His annual salary was approximately $234,000, plus benefits, stock awards, and a retention bonus paid in connection with the acquisition.

46.     On or about March 2, 2026, Elevance Health awarded Ms. Elefant and Mr. Koegel stock rights. In exchange for accepting the potentially valuable stock rights, they voluntarily

12

accepted a Performance Stock Unit Award Agreement, a Restricted Stock Unit Award Agreement, and a Nonqualified Stock Option Award Agreement. True and correct copies of these Agreements for Ms. Elefant are attached as Exhibit E, F, and G respectively and copies of these Agreements for Mr. Koegel are attached as Exhibit H, I, J, respectively (referred to together as the "Agreements").

47.    Under the Agreements, Ms. Elefant and Mr. Koegel acknowledged that, based on their employment with Elevance Health, they would have access to and use certain Confidential Information that constitutes trade secrets and confidential and proprietary business information of Elevance Health.

48.    Elevance Health's "Confidential Information" is defined as:

> [I]nformation created and used in its business which is not generally known by the public, including, but not limited to, plans, designs, concepts, computer programs, formulae, and equations; product fulfillment and supplier information; customer and supplier lists, and confidential business practices of the Company, Affiliates, and any of its customers, vendors, business partners or suppliers; profit margins and the prices and discounts the Company obtains or has obtained or at which it sells or has sold or plans to sell its products or services (except for public pricing lists); manufacturing, assembling, labor and sales plans and costs; business and marketing plans, ideas, or strategies; confidential financial performance and projections; employee compensation; employee staffing and recruiting plans and employee personal information; and other confidential concepts and ideas related to the Company's business... For purposes of this Agreement, Confidential Information includes, but is not limited to, information that constitutes a trade secret under applicable state or federal law.

(*See* Ex. E § 7(a)(i); Ex. F § 7(a)(i); Ex. G § 7(a)(i).)

49.    Pursuant to the Agreements, Ms. Elefant and Mr. Koegel agreed to the following restrictions on the use or disclosure of Elevance Health's Confidential Information ("Confidentiality Provision"):

> [The Participant] agrees that [the Participant] will not for himself or herself or for any other person or entity, directly or indirectly, without the prior written consent of the Company, while employed by the Company and thereafter: (A) use Confidential Information for the benefit of any person or entity other than the

13

Company or its affiliates; (B) remove, copy, duplicate or otherwise reproduce any document or tangible item embodying or pertaining to any of the Confidential Information, except as required to perform Participant's duties for the Company or its affiliates; or (C) while employed and thereafter, publish, release, disclose or deliver or otherwise make available to any third party any Confidential Information by any communication, including oral, documentary, electronic or magnetic information transmittal device or media. Upon Termination, Participant shall return all Confidential Information and all other property of the Company. This obligation of non-disclosure and non-use of information shall continue to exist for so long as such information remains Confidential Information.

(*See* Ex. E § 7(a)(ii); Ex. F § 7(a)(ii); Ex. G § 7(a)(ii).)

50. Because they would have access to Elevance Health's confidential information and trade secrets, Ms. Elefant and Mr. Koegel further agreed they would not, without prior written consent of Elevance Health, for the "Restriction Period" following the end of their employment with Elevance Health, "directly or indirectly, in the Restricted Territory,... obtain a Competitive Position or perform a Restricted Activity for or on behalf of a Competitor." The Restriction Period for Participants like them is the greater of the period of severance or twelve (12) months (the "Non-Compete Provision"). (*See* Ex. E § 7(b); Ex. F § 7(b); Ex. G § 7(b).)

51. Under the Agreements:

    a. "**Competitive Position**" means: any employment with or performance of services for or on behalf of a Competitor, if (A) the services to be performed by Participant are the same as or similar to the services that Participant performed for the Company in the last twenty-four (24) months of Participant's employment with Company (the "Look Back Period"), or (B) in the performance of such services, Participant will likely use any Confidential Information of the Company.

    b. "**Restricted Territory**" means: any geographic area in which the Company does business and which Participant provided services in, had responsibility for, had a material presence or influence in, or had access to or knowledge of Confidential Information about, such business, within the Look Back Period.

    c. "**Restricted Activity**" means: any activity for which Participant had responsibility for the Company or about which Participant had access to Confidential Information within the Look Back Period.

14

    d. "**Competitor**" means: any entity or individual (other than the Company) engaged in any one or more of the following: management of network-based managed care plans and programs; administration of managed care services; provision of health insurance, long-term care insurance, level-funded insurance, dental, life, or disability insurance; administration of flexible spending accounts, COBRA continuation coverage, coordination of benefits, or subrogation services; or the provision, delivery, or administration of health benefit plans or health care services such as pharmacy benefits management (including Specialty pharmacy), value-based care delivery, behavioral health, palliative care, care for chronic and complex conditions, digital healthcare platforms, medical benefits management solutions, or health care research (including health economics and outcomes); or any other aspects of the business or products or services offered by the Company, as to which Participant had responsibilities or received Confidential Information about, during the Look Back Period.

(*See* Ex. E § 7(b)(i)-(iv); Ex. F § 7(b)(i)-(iv); Ex. G § 7(b)(i)-(iv).)

52.    Ms. Elefant and Mr. Koegel also agreed that during the Restriction Period, they would not solicit business from any client, account, or medical care provider that they had contact with, responsibility for, or about which they had access to Confidential Information. They further agreed they would not solicit, hire, or attempt to solicit or hire any employee known to have access to Confidential Information giving unfair advantage to a Competitor, any Director-level or above employee, any employee to whom they reported or who reported to them, or any employee who worked for Elevance Health during the six month period preceding the solicitation or hire ("Employee Non-Solicitation Provision"). (*See* Ex. E § 7(c)-(d); Ex. F § 7(c)-(d); Ex. G § 7(c)-(d).)

53.    Ms. Elefant and Mr. Koegel agreed the Non-Competition Provision and Employee Non-Solicitation Provision were "reasonable and necessary to preserve the legitimate business interests of the Company, its present and potential business activities and the economic benefits derived therefrom." (*See* Ex. E § 9(a); Ex. F § 9(a); Ex. G § 9(a).)

54.     They also agreed these Provisions would "not prevent [them] from earning a livelihood in [their] chosen business and are not an undue restraint on the trade of [the Participant,] or any of the public interests which may be involved." (*Id.*)

55.     Ms. Elefant and Mr. Koegel also agreed, within five business days of receiving an offer of a Competitive Position with a Competitor, to provide Elevance Health's Chief Human Resources Officer with the identity of the Competitor and a detailed description of the job responsibilities to enable Elevance Health to determine whether the opportunity constitutes a violation of the Agreements. (*See* Ex. E § 7(b)(vi); Ex. F § 7(b)(vi); Ex. G § 7(b)(vi).)

**Mr. Koegel's Employment, Access to Confidential Information and Resignation**

56.     During his employment with Elevance Health, Mr. Koegel served as Director II, Claims. In that role, he oversaw claims adjudication for both Elevance Health's New York MLTC plan and its FIDE plan. He reported directly to Tracy Hedges, Regional Vice President of New York Medicaid Operations.

57.     Mr. Koegel was responsible for the administrative and operational functions of claims adjudication under the relevant MLTC and FIDE contracts. In addition to the claims adjudication work, Mr. Koegel oversaw employees who built and configured the claims adjudication system and workflow. In other words, Mr. Koegel oversaw both the administrative and technical components of how to build out and operate a claims adjudication system for MLTC and FIDE plans.

58.     Mr. Koegel was part of integration discussions following Elevance Health's acquisition of Centers. He has knowledge of Elevance Health's efforts to operate the FIDE plan and how it adjudicates claims under the FIDE plan. He knows Elevance Health's strengths and weaknesses as they relate to claims adjudication and its ability to resolve invoices from providers.

59.     Given his role, Mr. Koegel has knowledge of the rates Elevance Health pays providers and contract terms. He is intimately familiar with the technical workflow for claims processing, the configuration of its adjudication system, and the operational pain points Elevance Health has experienced in timely resolving provider payment issues.

60.     Mr. Koegel also has detailed knowledge of the challenges associated with timely paying providers and the steps Elevance Health takes to resolve those delays. Quick resolution of provider payment issues directly impacts relationships with providers. Most providers in the MLTC and FIDE space are small, community-based organizations for which timely payment is critical to making payroll. If payment is delayed or incorrect, providers become dissatisfied and will not refer members.

61.     Given his industry knowledge and experience, Mr. Koegel is highly valuable to Hamaspik. He can readily use his knowledge gained at Elevance Health—including knowledge of its claims adjudication systems, provider payment workflows, rates, contract terms, and operational pain points—and apply the knowledge at Hamaspik to develop a better technical workflow and more quickly resolve provider payment issues, giving Hamaspik an immediate and unfair competitive advantage.

62.     In May 2026, Mr. Koegel told his supervisor he was resigning from Elevance Health. On information and belief, Mr. Koegel said he was going to work for Hamaspik, who had reached out twice to recruit him, and was excited to work with Steven Hirsch again. This was telling. Mr. Hirsch is Centers' former Chief Information Officer.

63.     Mr. Koegel's last day at Elevance Health was May 29, 2026. Mr. Koegel did not provide the required written notice to Elevance Health's Chief Human Resources Officer within five business days of receiving an offer of a Competitive Position, as the Agreements require.

17

**<u>Ms. Elefant's Employment, Access to Confidential Information and Resignation</u>**

64.    During Ms. Elefant's employment at Elevance Health, she was a Director II, Healthcare Management Services and reported to Dr. Christy Valentine Theard, Plan President for Elevance Health Medicaid and Medicare in New York.

65.    A team of Elevance Health employees, including Directors, Care Managers, and Care Coordinators, reported directly to Ms. Elefant.

66.    Among other employees, Chedva Fox, Director Government Business Division, Special Programs reported to Ms. Elefant and she considered Ms. Fox a protégé and direct lieutenant.

67.    Poyu Li, Manager II, Medical Management, also reported to Ms. Elefant. Ms. Li worked on FIDE-related projects related to member grievances and appeals.

68.    Ms. Elefant oversaw and implemented critical aspects of Elevance Health's New York FIDE plan operations, including care management, utilization management, pharmacy care management, quality and HEDIS performance, implementation tracking, member barrier resolution, and team performance management. She helped develop Elevance Health's proprietary "whole person" care model—the methodology by which the FIDE plan delivers integrated care to eligible members through dedicated Care Managers and Care Coordinators who conduct health assessments, promote medication compliance, facilitate access to medical care, and coordinate all aspects of member services.

69.    Ms. Elefant's knowledge, experience, and leadership has played a significant role in the FIDE plan achieving and maintaining a five-star CMS rating—a distinction with direct financial implications for Elevance Health in terms of CMS bonus payments and competitive positioning.

70.      Ms. Elefant was also integral in developing Elevance Health's larger strategic initiatives, including building out Elevance Health's broader D-SNP strategy beyond New York FIDE plan. She participated in bi-weekly New York Senior Leadership meetings where the Senior Leadership discussed growth strategies, retention, performance improvement strategies for MLTC, Medicaid, and Medicare business lines.

71.      Thus, Ms. Elefant had access to and routinely used Elevance Health's Confidential Information, including its FIDE care model methodologies; D-SNP, MLTC, Medicare and Medicaid growth strategies; member engagement approaches; quality and HEDIS performance data; staffing models; operational workflows; provider network structures; utilization management protocols; FIDE plan policies, procedures, and protocols; and data regarding the strengths and weaknesses of its Medicare Advantage operations.

72.      Indeed, on July 2, 2026, during a meeting with Dr. Valentine, Ms. Elefant demonstrated the breadth of her access to Confidential Information by providing a detailed list of weaknesses and potential ways to improve FIDE membership and build out an Health Management Organization ("HMO") model—the very type of strategic intelligence invaluable to a competitor seeking to compete against Elevance Health in the FIDE plan management space.

73.      On June 24, 2026, Ms. Elefant told Dr. Valentine she planned to resign her employment. She did not disclose the identity of her new employer. She said only that she was going to work "with people she worked with for years [at Centers]." She offered three weeks' notice to assist with the transition of her work and job duties.

74.      On June 26, 2026, in the late afternoon, Ms. Elefant told Dr. Valentine she was going to work for Hamaspik. Ms. Elefant explained she was not looking to leave Elevance Health, but Hamaspik presented "an offer she couldn't refuse," specifically a large compensation increase

and shorter work hours. This also indicated Hamaspik actively recruited her and had long been in negotiations with her.

75.    On July 2, 2026, given the potential connection between former owners of Centers and Hamaspik, and Hamaspik's seeming efforts to hire multiple former Centers employees, Elevance Health terminated Ms. Elefant's access to its systems and relieved her of all duties, making July 2, 2026, her last day actively performing work for Elevance Health.

76.    Though Ms. Elefant told Human Resources Business Partner Amy Glenn about her new employment, she did not tell Ms. Glenn her new job title or job description. Notably, Ms. Elefant never gave written notice to Elevance Health's Chief Human Resources Officer within five business days of receiving an offer of a Competitive Position. Nor did she provide a detailed description of the job responsibilities and the identity of the Competitor, as Section 7(b)(vi) of the Agreements requires.

77.    On information and belief, on July 13, 2026, Ms. Elefant began her employment with Hamaspik in a substantially similar, if not identical, role as her role at Elevance Health.

78.    Shortly thereafter, on July 13 and 14, 2026, respectively, two of Ms. Elefant's direct reports, Ms. Fox and Ms. Li provided Elevance Health notice of their resignations.

79.    On information and belief, Ms. Elefant told Ms. Fox and Ms. Li she was joining Hamaspik and solicited them to resign their Elevance Health employment to join Hamaspik.

### Ms. Castillo and Mr. Robu's Employment, Access to Confidential Information and Resignations

80.    Ms. Castillo worked for Centers and became an Elevance Health employee after the acquisition. At Centers, she was Director of Provider Operations, overseeing the back-end administration of provider operations and provider contracting. In that role, she oversaw

relationships with numerous third-party vendors used by Centers, including vendors that provided critical operational and member-service functions.

81. At Elevance Health, Ms. Castillo served as Director of Network Support. She was responsible for directing the development, implementation, and performance of healthcare provider networks, including leading contract negotiations, ensuring network adequacy, developing cost-effective strategies, and managing provider relations. She took over delegation oversight—working with dental vendors, vision vendors, and other medical vendors—finalizing contracts, establishing rates, and managing a team that conducted quarterly audits and monitored delegated vendors.

82. Ms. Castillo had visibility into provider payments, provider relationships, and the operational pain points and successes of Elevance Health's provider network. She had access to confidential rate information, contract terms, and provider relationship strategies.

83. On or about April 13, 2026, Ms. Castillo resigned her employment with Elevance Health. She is now Vice President of Provider Relations and Contracting at Hamaspik. On information and belief, Ms. Castillo's job duties are virtually identical to her former job duties at Elevance Health.

84. Mr. Robu also worked for Centers and became an Elevance Health employee after the acquisition.

85. Mr. Robu was a Manager Sales for Elevance Health and was responsible for, among other things: managing sales operations for Medicare products; implementing sales initiatives with Field Marketing Organizations ("FMO") agencies to increase member enrollment in the MLTC plan; cultivating strategic partnerships with FMO agencies and healthcare providers; leading retention efforts to increase member satisfaction, improve customer experience and loyalty; and

designing plan benefits for MAP, D-SNP, and MAP plans to meet market needs. Mr. Robu was also involved in building up FIDE sales.

86.     On December 15, 2025, Mr. Robu ended his employment with Elevance Health. He is currently Director of Medicare Sales at Hamaspik.

87.     Mr. Robu's job duties at Hamaspik are virtually identical to his former job duties at Elevance Health. At Hamaspik, on information and belief, Mr. Robu leads strategic planning and execution of sales initiatives for MLTC and Medicare products; implements sales strategies and promotional campaigns tailored to the Medicare market; establishes and maintains strong relationships with key stakeholders, including healthcare providers, brokers, and clients, to drive business development and customer satisfaction; and manages and develops Hamaspik's sales team.

**Ms. Elefant, Mr. Robu, and Ms. Castillo Surreptitiously Send Themselves Elevance Health's Confidential Information and Trade Secrets in Advance of Their Resignations**

88.     In the weeks and days leading up to their departure from Elevance Health, each of Ms. Elefant, Mr. Robu, and Ms. Castillo engaged in a deliberate course of conduct to misappropriate Elevance Health's Confidential Information and trade secrets for the purpose of bringing them to Hamaspik.

89.     As to Ms. Elefant, on June 21 and 22, 2026, she sent at least nine separate emails to her personal email account, each containing attachments of Elevance Health's confidential and proprietary documents. These emails transmitted scores of Elevance Health's confidential and proprietary files and trade secrets, including one email that alone contained 53 separate attachments. In total, Ms. Elefant took approximately 192 documents immediately before resigning from Elevance Health.

22

90.     Among the most critical documents containing Elevance Health trade secrets Ms. Elefant sent to herself are:

a. **Health Risk Assessment Workflow.**  This document is Elevance Health's proprietary internal workflow governing the frequency, methodology, and detailed step-by-step process by which Care Managers conduct Health Risk Assessments ("HRAs") for FIDE Medicare members. The HRA Workflow sets forth Elevance Health's proprietary protocols for the timing and completion of initial, routine, and post-hospitalization HRAs; the specific methods for completing assessments using the Uniform Assessment System ("UAS") and the CCM Monthly assessment tools; the internal documentation requirements, including Smartsheet tracking and CaseTrakker data entry fields; the protocols for Interdisciplinary Care Team ("ICT") collaboration, including outreach to primary care providers; and the procedures for generating and distributing Person Centered Service Plans ("PCSPs") to members and providers. This document reflects years of operational refinement and embodies the precise clinical workflows that underpin Elevance Health's five-star FIDE care model—workflows that are not publicly available and that a competitor could not replicate without significant time, investment, and experimentation. A copy of Ms. Elefant's Email to her personal account attaching the Health Risk Assessment Workflow is attached as Exhibit K.

b. **D-SNP Model of Care.** This document is a comprehensive, approximately 193-page internal plan setting forth the entirety of Elevance Health's Model of Care for its D-SNP, including both its Coordination Only D-SNP and its FIDE D-SNP (Medicaid Advantage Plus). The D-SNP Model of Care, which was among the trade secrets acquired from Centers, contains the proprietary methodologies and operational frameworks underlying Elevance Health's approach to identifying, stratifying, and managing its most vulnerable enrollee populations; its detailed care coordination framework, including the roles, responsibilities, and workflows of its Interdisciplinary Care Teams; its staffing structure and organizational hierarchy for clinical and administrative departments; its proprietary Health Risk Assessment tools and risk stratification methodologies; its protocols for care transitions across healthcare settings; its Individualized Care Plan development and maintenance processes; its provider network composition and specialized expertise requirements; its quality assurance and performance improvement goals, including measurable health outcome targets tied to CMS star ratings; and its clinical practice guidelines and evidence-based protocols for the D-SNP population. This document represents the complete operational blueprint for building and operating a D-SNP and FIDE plan—the institutional knowledge that Elevance Health invested millions of dollars to develop and acquire through the Centers acquisition—and is the type of comprehensive operational framework that would allow a competitor to replicate Elevance Health's managed care infrastructure without the years of investment required to develop it independently. A copy of Ms. Elefant's Email

to her personal account attaching the D-SNP Model of Care is attached as <u>Exhibit L</u>.

c. **Stars Overview**. This document is an internal presentation setting forth Elevance Health's proprietary strategy, performance monitoring framework, and operational approach to CMS Medicare Star Ratings. The Stars Overview contains Elevance Health's internal analysis of how Star performance impacts its revenue, margin, and competitive positioning; its proprietary annual planning and monitoring methodology, including the "Evaluate, Establish, Prioritize, Align, Execute" framework; its internal performance data and contract-level Star metrics; its detailed breakdown of D-SNP membership by contract, including membership figures and percentages across its national portfolio; its proprietary assessment of Star program complexities, including projected internal cut points, downstream impacts of business decisions on Star Ratings, and unique regional challenges; and its multi-year strategic roadmap for achieving industry-leading Star performance across measurement, scoring, and payment cycles. Star Ratings directly determine CMS bonus payments and reimbursement rates, and this document provides a competitor with the precise competitive intelligence needed to understand and exploit Elevance Health's Star strategy, contract-level performance vulnerabilities, and operational priorities—information that is not publicly available and that Elevance Health maintains as among its most closely guarded competitive intelligence. A copy of Ms. Elefant's Email to her personal account attaching the Stars Overview is attached as <u>Exhibit M.</u>

91.    Some of the documents Ms. Elefant misappropriated bear the "Anthem" name—the name Elevance Health operates under in New York City —while others bear the Centers name. Regardless of the branding or headings, these documents contain Elevance Health's trade secret information and remain its confidential and proprietary property.

92.    As to Mr. Robu, he sent Elevance Health confidential information and trade secrets to himself before resigning his employment, including: (a) the 2025 Medicare Compensation Plan documents, which contain detailed compensation structures for Field Sales Managers and Phone Benefits Advisors, including commission rates, tiers, bonuses, and qualification criteria; (b) current forecasts and growth projections; and (c) a more than 400-page Events Management Master Programs Tracker Report ("Master Report") containing the names, locations, names of points of contact, and contact information for points of contact related to sales and marketing

24

events and community partners. A copy of Mr. Robu's Emails to his personal account are attached as Exhibit N.

93.     Ms. Castillo also emailed Elevance Health documents to herself, including: (a) template provider agreements, including legacy Centers Federally Qualified Health Center ("FQHC") agreements, IPA agreements, and delegated services agreements; (b) contracting refresher training materials; (c) provider contracting department training guides and workflows; and (d) rate information, including home infusion rates and CPT codes. A copy of Ms. Castillo's emails to her personal account are attached as Exhibit O.

94.     The documents Defendants Elefant, Robu, and Castillo misappropriated include, but are not limited to, Elevance Health's confidential and proprietary policies, materials, and operational documents relating to its D-SNP and FIDE plan operations—the very operations Hamaspik recruited them to replicate for its benefit.

95.     The documents Ms. Elefant, Mr. Robu, and Ms. Castillo misappropriated—including confidential policies, materials, and operational documents relating to Elevance Health's D-SNP and FIDE plan operations—derive independent economic value from not being generally known or readily ascertainable by competitors. These materials embody Elevance Health's proprietary know-how regarding the design, implementation, administration, and oversight of its MLTC, D-SNP, and FIDE businesses, which Elevance Health developed through substantial investment. Because the information would enable a competitor to accelerate the development and launch of a competing plan and replicate key aspects of Elevance Health's operations without incurring the same costs and effort, the information possesses significant economic value.

96.     Elevance Health considers all these materials confidential and maintains their secrecy through restricted access controls, secure internal information systems, employee

confidentiality obligations, and other reasonable measures designed to prevent unauthorized disclosure and use.

97.    Ms. Elefant, Mr. Robu, and Ms. Castillo's conduct—emailing scores of documents containing Elevance Health's trade secrets to their personal email accounts before resigning their employment, and then immediately joining Hamaspik, a direct competitor in the MLTC, the D-SNP and FIDE marketplace—shows they took these materials with the intent to use them in their new roles at Hamaspik. There is no other explanation for why a departing employee would email themself the comprehensive operational blueprint for building and running the very type of plan their new employer is seeking to expand.

98.    These Defendants misappropriated Elevance Health's trade secrets to give Hamaspik an unfair competitive advantage in the MLTC, D-SNP and, particularly, FIDE marketplace—enabling Hamaspik to replicate Elevance Health's proprietary care model, clinical workflows, quality management approaches, and Star Ratings strategies without having to invest like Elevance Health. These documents, combined with these Defendants' institutional knowledge of Elevance Health's operations, provide Hamaspik with a ready-made roadmap to build and expand a competing FIDE plan using Elevance Health's trade secrets and Confidential Information.

## COUNT I
## BREACH OF CONTRACT – NON-COMPETE PROVISION
### (*Against Defendants Elefant and Koegel*)

99.    All previous paragraphs are incorporated by reference herein.

100.    Defendants Elefant and Koegel each agreed to the Agreements, which are valid and enforceable contracts supported by adequate consideration, specifically eligibility for stock rights which Defendants freely accepted.

101.    The Agreements' Non-Compete Provisions, which prohibit Defendants Elefant and Koegel from working in a Competitive Position or performing Restricted Activities with a Competitor during the Restriction Period (twelve (12) months following termination of employment) are reasonable in time, geography and scope of restrictive activities.

102.    The Non-Competition Provisions are reasonably necessary to protect Elevance Health's interest in its Confidential Information.

103.    Elevance Health performed all conditions required of it under the Agreements.

104.    Ms. Elefant and Mr. Koegel's new positions with Hamaspik are Competitive Positions under the Agreements because they are, or will be, providing the same or similar services to Hamaspik that they provided to Elevance Health.

105.    Ms. Elefant and Mr. Koegel's employment with Hamaspik is in the Restricted Territory because it is in the same geographic area (New York) in which Elevance Health does business and for which Ms. Elefant and Mr. Koegel had responsibility and influence.

106.    Based on the above, Ms. Elefant and Mr. Koegel breached the Non-Compete Provision by seeking and/or accepting a Competitive Position with Hamaspik, a Competitor, in a Restricted Territory, without prior written consent of Elevance Health, during the Restricted Period.

107.    As a direct and proximate result of Defendant Elefant's and Koegel's clear breaches of their obligations under the Non-Compete Provisions, Elevance Health has suffered, and will continue to suffer, both monetary damages and irreparable harm for which there is no adequate remedy at law.

**COUNT II**
**BREACH OF CONTRACT – NON-SOLICIT PROVISION**
(*Against Defendant Elefant*)

108.     All previous paragraphs are incorporated by reference herein

109.     The Employee Non-Solicitation Provision in the Agreements prohibits Ms. Elefant, during the Restriction Period, from soliciting, hiring, attempting to solicit or hire, or participating in any attempt to solicit or hire any employee who held the position of Director or higher in the six (6) months before the solicitation or any employee who reported to Ms. Elefant at any time in the six (6) months before the solicitation.

110.     Ms. Fox holds a Director-level position and reported directly to Ms. Elefant before Ms. Elefant resigned her employment.

111.     Ms. Li reported to Ms. Elefant before she resigned her employment.

112.     Both employees provided notice of their resignations shortly after Ms. Elefant and, upon information and belief, are joining Hamaspik.

113.     Ms. Elefant breached the Employee Non-Solicitation by soliciting or participating in the solicitation of Ms. Fox and Ms. Li to resign their employment and join Hamaspik.

114.     As a direct and proximate result of Ms. Elefant's blatant breach of the Employee Non-Solicitation Provision, Elevance Health has suffered, and will continue to suffer, both monetary damages and irreparable harm for which there is no adequate remedy at law.

**COUNT III**
**BREACH OF CONTRACT – CONFIDENTIALITY PROVISION**
(*Against Defendant Elefant*)

115.     All previous paragraphs are incorporated by reference herein

116.     The Agreements' Confidentiality Provision prohibits Ms. Elefant from, among other things, using Confidential Information, as defined by the Agreements, for the benefit of

another company; removing, copying, duplicating any Confidential information; or publishing, releasing, or disclosing to any third party any Confidential Information.

117.    The Confidentiality Provision also requires Ms. Elefant to return all Confidential Information to Elevance Health.

118.    As explained above, before Ms. Elefant resigned from her employment, she sent at least nine emails attaching nearly 200 Elevance Health documents containing Confidential Information and trade secrets to her personal email account. Ms. Elefant removed the Elevance Health documents from its secured systems without Elevance Health's permission.

119.    The documents she sent to her personal email contain Confidential Information under the Agreements, including confidential business practices of Elevance Health, workflows, business and marketing plans, ideas, and strategies.

120.    On information and belief, Ms. Elefant has used or disclosed, or intends to use or disclose Elevance Health's Confidential Information to perform her job duties at Hamaspik.

121.    As direct and proximate result of Ms. Elefant's breach of the Confidentiality Provision, Elevance Health has suffered, and will continue to suffer, both monetary damages and irreparable harm for which there is no adequate remedy at law.

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (*Against Hamaspik*)

122.    All previous paragraphs are incorporated by reference herein.

123.    Valid and enforceable contracts exist between Elevance Health and Ms. Elefant and Elevance Health and Mr. Koegel, specifically the Agreements.

124.    Hamaspik knew or should have known of the Agreements and that both Ms. Elefant and Ms. Koegel are subject to post-employment restrictive covenants prohibiting them from

competing with Elevance Health and/or soliciting Elevance Health employees for the benefit of a Competitor.

125.    Despite this knowledge, Hamaspik intentionally and improperly induced and/or caused Ms. Elefant and Mr. Koegel to breach their contractual obligations to Elevance Health by recruiting them to accept competitive positions at Hamaspik and/or encouraging and/or inducing them to solicit other Elevance Health employees to resign their employment and join Hamaspik.

126.    Hamaspik acted with knowledge of Ms. Elefant and Mr. Koegel's contractual obligations and in reckless disregard of Elevance Health's contractual rights. Hamaspik's interference was not justified by legitimate business interests but was part of its broader scheme to systematically hire Elevance Health employees to gain an unfair competitive advantage.

127.    As a direct and proximate result of Hamaspik's tortious interference, at least four Elevance Health employees have resigned their employment to work for Hamaspik, and Elevance Health is at risk of losing even more employees to a direct competitor if their conduct continues unabated.

128.    As a direct and proximate result of Hamaspik's tortious interference, Elevance Health has suffered, and will continue to suffer, damages, including but not limited to loss of the benefit of the restrictive covenants, loss of competitive advantage, recruitment and training costs, and irreparable harm.

**COUNT V**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836**
(*Against Defendants Elefant, Koegel, Robu, Castillo, and Hamaspik*)

129.    All previous paragraphs are incorporated by reference herein.

130.    The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., provides a private action for misappropriation of trade secrets "related to a product or service used in, or intended for use in, interstate foreign commerce." 18 U.S.C. § 1836(b)(1).

131.    A party may seek injunctive relief to prevent any actual or threatened misappropriation of its trade secrets. 18 U.S.C. § 1836(b)(3).

132.    Misappropriation includes threatened disclosure or use of trade secrets without the express or implied consent of the trade secret's owner by a person who at the time of disclosure or use, knew or had reason to know the trade secret was derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret. 18 U.S.C. § 1839(5)(B).

133.    Elevance Health owns trade secrets as defined by 18 U.S.C. § 1839(3), including but not limited to: FIDE care model methodologies and implementation strategies; the "whole of person" care model structure and operational workflows; member engagement strategies and the "secret sauce" that produces a five-star plan; Care Manager staffing models and assignment protocols; utilization management protocols; quality/HEDIS performance strategies; pharmacy care management approaches; D-SNP growth strategies; provider network structures and integration methodologies; and data regarding strengths, weaknesses, and competitive positioning of Elevance Health's Medicare Advantage operations.

134.    Elevance trade secrets relate to products and services used in, and intended for use in, interstate commerce. Elevance Health serves more than 40 million members nationwide, operates Medicare Advantage health plans in more than 20 states, and competes for Medicare and Medicaid managed care contracts across the country.

31

135.    Elevance Health's trade secrets derive independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure or use.

136.    Elevance Health's trade secrets provide it with a substantial competitive advantage in administering New York FIDE plans and other dual Medicare and Medicaid eligible plans. If disclosed to or used by a competitor such as Hamaspik, this information will allow that competitor to undercut Elevance Health's bids to administer Mediare Advantage FIDE plans, replicate its strategies, and neutralize years of investment in competitive positioning.

137.    Elevance Health took reasonable measures to maintain the secrecy of this information, including requiring employees to execute agreements containing strict confidentiality provisions and restrictive covenants; adopting a Code of Conduct and company-wide confidentiality policies; limiting access to those with a legitimate business need; and housing confidential data on password-protected systems.

138.    Defendants Elefant, Koegel, Robu and Castillo acquired knowledge of Elevance Health's trade secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use. Specifically, Ms. Elefant and Mr. Koegel agreed, pursuant to the Agreements, not to use Confidential Information for the benefit of any person or entity other than Elevance Health, and not to disclose such information to any third party. Additionally, as Elevance Health employees, Defendants Elefant, Koegel, Robu and Castillo were subject to the Company's Code of Conduct and Confidentiality Policy which, govern the protection of confidential and proprietary information and applies to all employees and former employees.

139.    Defendants Elefant, Robu and Castillo improperly acquired Elevance Health's confidential information and trade secrets by emailing documents containing such information to

themselves within days of leaving Elevance Health. These Defendants took hundreds of documents, including confidential and proprietary policies, materials, operational documents, staffing structures, workflow processes, member engagement strategies, and quality management approaches relating to Elevance Health's MLTC, D-SNP, and FIDE plan operations.

140.    Further, Defendants threaten to misappropriate Elevance Health's trade secrets within the meaning of 18 U.S.C. § 1836(b)(1).

141.    The threat of misappropriation is particularly acute when: (1) Defendants had extensive access to Elevance Health's trade secrets; (2) Defendants' new employer, Hamaspik, is a direct competitor; and (3) Defendants' new positions are so substantially similar that they cannot help but rely on Elevance Health's trade secrets in performing their new duties

142.    These Defendants knew or had reason to know the information they took was confidential and proprietary. Each was subject to Elevance Health's Confidentiality Policy.

143.    On information and belief, these Defendants have or will use or disclose the misappropriated information in their respective new positions at Hamaspik.

144.    On information and belief, Hamaspik knowingly permitted, facilitated, and benefited from the individual Defendants' use of Elevance Health's misappropriated confidential information and trade secrets in performing their duties for Hamaspik.

145.    Given Hamaspik's systematic hiring of former Elevance Health employees performing the same functions, Hamaspik knew or should have known these employees might bring and use confidential information and trade secrets information from their former employer and did nothing to stop them from doing so.

146.    On information and belief, Hamaspik has acquired and retains the misappropriated information and has used, will use, or is likely to use, that information to compete in the New York MLTC and FIDA marketplace.

147.    As a direct and proximate result of these Defendants' unlawful acquisition, misappropriation, and threatened use of Elevance Health's trade secrets and confidential information, Elevance Health has suffered and will continue to suffer immediate and irreparable harm. Hamaspik's conduct has allowed it to shortcut years of investment and development by leveraging Elevance Health's confidential information and trade secrets to advance its own competing MLTC and FIDE operations. Once disclosed or used by Hamaspik, Elevance Health's trade secrets cannot be returned to their prior state of secrecy, and Elevance Health will suffer continuing harm through the loss of exclusivity, diminished competitive advantage, and the risk of further unauthorized use and disclosure.

## COUNT VI
## MISAPPROPRIATION OF TRADE SECRETS UNDER NEW YORK LAW
### *(Against Defendants Elefant, Robu, Castillo, and Hamaspik)*

148.    All previous paragraphs are incorporated by reference herein.

149.    Elevance Health owns trade secrets, including but not limited to: claims adjudication system configurations and workflows; provider payment rates and contract terms; operational methodologies for MLTC and FIDE plan administration; knowledge of Elevance Health's strengths, weaknesses, and competitive positioning regarding claims adjudication and provider payment resolution; and technical specifications for building and configuring claims adjudication systems.

150.    Elevance Health's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, competitors

such as Hamaspik. These trade secrets represent years and millions of dollars of investment in development, refinement, and implementation, and cannot be lawfully replicated without undertaking the same substantial time, expense, and resources Elevance Health devoted to creating them.

151. Elevance Health took reasonable measures to maintain the secrecy of this information, including requiring employees to execute agreements containing strict confidentiality provisions and restrictive covenants; adopting company-wide confidentiality policies; limiting access to those with a legitimate business need; and housing confidential data on password-protected systems.

152. Defendants Elefant, Robu and Castillo acquired knowledge of Elevance Health's trade secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use. Specifically, Ms. Elefant agreed, pursuant to the Agreements, not to use Confidential Information for the benefit of any person or entity other than Elevance Health, and not to disclose such information to any third party. Additionally, as Elevance Health employees, Defendants Elefant, Robu and Castillo were subject to the Company's Code of Conduct and Confidentiality Policy which, govern the protection of confidential and proprietary information and applies to all employees and former employees.

153. Defendants Elefant, Robu and Castillo improperly acquired Elevance Health's confidential information and trade secrets by emailing documents containing such information to themselves within days of leaving Elevance Health. These Defendants took hundreds of documents, including confidential and proprietary policies, materials, operational documents, staffing structures, workflow processes, member engagement strategies, and quality management approaches relating to Elevance Health's MLTC, D-SNP, and FIDE plan operations.

154. These Defendants knew or had reason to know the information they took was confidential and proprietary. Each was subject to Elevance Health's Confidentiality Policy, which prohibited them from disclosing or using confidential information during or after employment and required the return of all company property upon termination. By emailing this information immediately before departing Elevance Health and joining Hamaspik, these Defendants willfully violated their confidentiality obligations.

155. On information and belief, these Defendants have or will use or disclose the misappropriated information in their respective new positions at Hamaspik. Their roles at Hamaspik are virtually identical to their former roles at Elevance Health, and the misappropriated documents are directly relevant and useful to the performance of their roles and assisting Hamaspik in developing and implementing a FIDE plan.

156. On information and belief, Hamaspik knowingly permitted, facilitated, and benefited from the individual Defendants' use of Elevance Health's misappropriated confidential information and trade secrets in performing their duties for Hamaspik.

157. Given Hamaspik's systematic hiring of former Elevance Health employees performing the same functions, Hamaspik knew or should have known these employees might bring and use confidential information and trade secrets information from their former employer and did nothing to stop them from doing so.

158. On information and belief, Hamaspik has exploited, and continues to exploit, the misappropriated information to compete in the New York MLTC and FIDE plan marketplace.

159. As a direct and proximate result of these Defendants' unlawful acquisition, misappropriation, and threatened use of Elevance Health's trade secrets and confidential information, Elevance Health has suffered and will continue to suffer immediate and irreparable

harm. Hamaspik's conduct has allowed it to shortcut years of investment and development by leveraging Elevance Health's confidential information and trade secrets to advance its own competing MLTC and FIDE operations. Once disclosed or used by Hamaspik, Elevance Health's trade secrets cannot be returned to their prior state of secrecy, and Elevance Health will suffer continuing harm through the loss of exclusivity, diminished competitive advantage, and the risk of further unauthorized use and disclosure.

**COUNT VII**
**UNFAIR COMPETITION**
(*Against Hamaspik*)

160.    All previous paragraphs are incorporated by reference herein.

161.    Since late 2025, Hamaspik has engaged in a deliberate and systematic scheme to hire former Elevance Health/Centers employees for the purpose of gaining an unlawful competitive advantage in the administration of MLTC and FIDE plans in New York.

162.    Hamaspik's scheme includes hiring employees bound by restrictive covenants (Ms. Elefant and Mr. Koegel and, on information and belief, others to follow), employees who knowingly misappropriated confidential information and trade secrets (Ms. Elefant, Ms. Castillo and Mr. Robu), and other Elevance Health employees with institutional knowledge critical to MLTC and FIDE plan operations.

163.    Hamaspik's conduct constitutes unfair competition under New York law. Hamaspik has misappropriated Elevance Health's labor, skill, expenditures, and goodwill by exploiting confidential information and trade secrets wrongfully obtained through its systematic hiring scheme, thereby securing a competitive advantage in the New York MLTC and FIDE plan market it could not have lawfully or independently achieved.

164.    Hamaspik's actions are in bad faith and with the intent to unfairly capitalize on Elevance Health's substantial investment of time, labor, and resources—including hundreds of millions of dollars spent to acquire Centers—in developing its confidential business information, trade secrets, and competitive positioning in the MLTC and FIDE markets.

165.    As a direct and proximate result of Hamaspik's unfair competition, Elevance Health has suffered and will continue to suffer substantial damages and irreparable harm, including the loss of competitive advantage in the New York MLTC and FIDE markets, diminution in the value of its confidential business information and trade secrets, loss of goodwill, lost business opportunities, and the erosion of valuable provider, vendor, and member relationships.

166.    Elevance Health has no adequate remedy at law for Hamaspik's ongoing and threatened unfair competitive conduct, and unless enjoined, Hamaspik will continue to unfairly compete with Elevance Health using misappropriated confidential information and poached employees, to the continuing and detriment of Elevance Health.

## COUNT VIII
## CIVIL CONSPIRACY
### (*Against all Defendants*)

167.    All previous paragraphs are incorporated by reference.

168.    Beginning in late 2025 and continuing through the present, Defendants agreed and combined among themselves to engage in a coordinated scheme to systematically recruit and hire Elevance Health's key personnel, to misappropriate and exploit Elevance Health's confidential information and trade secrets, and to use that information and those employees to unlawfully compete with Elevance Health in the New York MLTC and FIDE plan markets.

169.    Hamaspik knowingly and intentionally sought out and recruited employees, including Defendants Elefant, Koegel, Robu, and Castillo, whom it knew were bound by post-

38

employment restrictive covenants and/or possessed confidential, proprietary, and trade secret information belonging to Elevance Health, for the purpose of rapidly and unlawfully rebuilding the very managed care infrastructure Elevance Health acquired through its purchase of Centers.

170.    Defendant Elefant, Robu, Castillo and, on information and belief, Defendant Koegel, in agreement and coordination with Hamaspik, each undertook to misappropriate Elevance Health's confidential and trade secret information, for the purpose of delivering that information to Hamaspik and using it to benefit Hamaspik's competing operations.

171.    Defendant Elefant, in furtherance of the conspiracy, also solicited and induced at least two of her direct reports, Ms. Fox and Ms. Li, to resign their employment with Elevance Health and join Hamaspik, further advancing the common scheme to strip Elevance Health of the personnel and knowledge needed to operate its MLTC and FIDE plans.

172.    In furtherance of this agreement and combination, each Defendant committed one or more overt acts, including, without limitation: (a) Hamaspik's systematic solicitation and hiring of at least seven former Elevance Health/Centers employees, including Defendants Elefant, Koegel in knowing violation of their Non-Compete Provision; (b) Defendants Elefant, Robu, Castillo and, on information and belief, Defendant Koegel, transmission of Elevance Health's confidential information and trade secrets before and/or after they resigned their employment; (c) each individual Defendant's acceptance of a position at Hamaspik that is substantially similar or identical to the position that Defendants held at Elevance Health; and (d) Hamaspik's knowing acceptance, retention, and use of the misappropriated confidential information and trade secrets brought to it by Defendants Elefant, Robu, Castillo and, on information and belief, Defendant Koegel.

173.     Each Defendant knowingly and intentionally participated in the conspiracy and in the overt acts taken in furtherance of it, with full knowledge of the unlawful object of the scheme, namely, to strip Elevance Health of its personnel, confidential information, and trade secrets, and to use them to give Hamaspik an unfair competitive advantage in the New York MLTC and FIDE plan markets.

174.     As a direct and proximate result of Defendants' civil conspiracy, Elevance Health has suffered, and will continue to suffer, irreparable harm, including but not limited to loss of goodwill, damage to its business reputation, loss of competitive advantage, erosion of provider, vendor, and member relationships, and diminution in the value of its confidential business information and trade secrets, for which there is no adequate remedy at law.

175.     As a further direct and proximate result of Defendants' civil conspiracy, Elevance Health has suffered, and will continue to suffer, monetary damages in an amount to be determined at trial, including but not limited to lost business opportunities, recruitment and training costs, and losses associated with the diminished value of its confidential information and trade secrets.

<strong><u>JURY DEMAND</u></strong>

176.     Elevance Health hereby demands a jury trial on all triable issue.

<strong><u>PRAYER FOR RELIEF</u></strong>

**WHEREFORE**, this Court should enter judgment in Elevance Health's favor and against Defendants Hamaspik, Esther Elefant, Adam Koegel, Vladamir Robu, and Yaritza Castillo, and award Elevance Health the following relief:

a.     A preliminary and permanent injunction enjoining Esther Elefant and Adam Koegel from continuing to work in a role at Hamaspik that constitutes a Competitive Position within the meaning of the Agreements and directly or indirectly soliciting, recruiting, or inducing any Elevance Health employee to leave Elevance Health's employ;

40

b.    A preliminary and permanent injunction enjoining Hamaspik from employing Esther Elefant and Adam Koegel in violation of the Non-Compete Provision contained in the Agreements with Elevance Health;

c.    A preliminary and permanent injunction enjoining all Defendants from, whether directly or indirectly, from using, disclosing, transmitting, copying, downloading, retaining, deleting, destroying, modifying, disseminating, or otherwise any confidential, proprietary, or trade secret information or documents belonging to Elevance Health;

d.    An order requiring all Defendants to immediately cease all document and information deletion protocols and preserve all documents, communications, electronically stored information, devices, accounts, repositories, cloud-storage locations, email accounts, messaging applications, removable media, logs and other materials, including those that contain, reflect, reference, or relate to: (a) Elevance Health's confidential, proprietary, and/or trade secret information; (b) Defendants' acquisition, retention, storage, dissemination, or use of Elevance Health's confidential information; (c) Defendants' communications concerning Elevance Health's employees, and/or Elevance Heath's providers and/or plan members; (d) any efforts by Defendants to solicit, recruit, or communicate with Elevance Heath's employees; or (e) any communications between Defendants concerning Elevance Health or any Elevance Health employee. Such preservation shall be made by creating and maintaining a separate forensic copy of all such materials, which copy shall be retained by Defendants' counsel or a neutral third party and shall not be accessible to any Defendant or individual custodian;

e.    An order requiring all Defendants within 5 business days to return to Elevance Health all confidential, proprietary, and trade secret information belonging to Elevance Health in Defendants' possession, custody, or control;

f.    An order requiring all Defendants within 5 business days to permanently delete all information delivered to Elevance Health in connection with Paragraph (e) above from all devices, computers, mobile phones, tablets, removable media, cloud-storage locations, repositories, accounts (including email accounts), and any other locations on which any confidential, proprietary, or trade secret information belonging to Elevance Health was stored, accessed, downloaded, transmitted, copied, or maintained, subject to the preservation obligations set forth in Paragraph (d);

g.    An order requiring all Defendants within 5 business days to provide a sworn declaration identifying:

i.    all devices, computers, mobile phones, tablets, removable media, cloud-storage locations, repositories, accounts (including email accounts), messaging applications, and other locations on which any confidential,

41

        proprietary, or trade secret information belonging to Elevance Health was stored, accessed, downloaded, transmitted, copied, or maintained;

    ii.    the categories of Elevance Health's information retained, downloaded, copied, transmitted, accessed, or maintained by the individual Defendant;

   iii.    all persons to whom Elevance Health's confidential, proprietary, or trade secret information was disclosed, transmitted, made available, or discussed;

   iv.    whether any of Elevance Health's confidential, proprietary, or trade secret information was shared with any employee, officer, director, contractor, consultant, or agent of any of Hamaspik; and

    v.    the steps taken to preserve, return, remove, and cease use of Elevance Health's confidential, proprietary, or trade secret information or otherwise comply with this Order

h.    An order permitting Elevance Health to immediately serve expedited discovery concerning Defendants' acquisition, retention, possession, dissemination, storage, preservation, disclosure, and use of Elevance Health's confidential, proprietary, or trade secret information, Hamaspik's efforts to solicit, recruit, or communicate with the individual Defendants and other Elevance Health's employees, and the individual Defendants' job duties and responsibilities at Hamaspik. Defendants shall respond to such discovery on an expedited schedule established by the Court;

i.    An order requiring all Defendants within 10 business days to produce documents and communications concerning: (a) Elevance Health's confidential, proprietary, and/or trade secret information, including acquisition, retention, possession, dissemination, storage, preservation, disclosure, an use of Elevance Health's confidential, proprietary, or trade secret information; and (b) efforts to solicit, recruit, or communicate with Elevance Health's employees;

j.    An award of compensatory damages against each Defendant in amounts to be determined at trial;

k.    An award of disgorgement of unjust enrichment against each Defendant who has misappropriated Elevance Health's confidential information and trade secrets;

l.    An award of punitive damages against each Defendant who has misappropriated Elevance Health's confidential information and trade secrets;

m.    An award of punitive damages against Hamaspik for its tortious interference with Elevance Health's contractual relations and unfair competitive conduct;

n.       award Elevance Health its reasonable attorneys' fees and costs incurred in bringing and prosecuting this action;

o.       An award of pre-judgment and post-judgment interest at the maximum lawful rate;

p.       Such other and further relief as this Court deems just and proper.

Date: July 27, 2026

Respectfully submitted,

REED SMITH LLP

*/s/ Samantha Kennedy*
599 Lexington Ave.
New York, New York 1002
Telephone: (212).549.0318
Fax: (212).521.5450
Email: skennedy@reedsmith.com

James N. Boudreau
(*pro hac vice* motion forthcoming)
Adam R. Roseman
(*pro hac vice* motion forthcoming)
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Telephone: (215) 851-8102/8103
Fax: (215) 851-1420
Email: jboudreau@reedsmith.com;
aroseman@reedsmith.com

*Counsel for Plaintiff*
*The Elevance Health Companies, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELEVANCE HEALTH COMPANIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> HAMASPIK  INC., ESTHER ELEFANT, ADAM KOEGEL, VLADAMIR ROBU, and YARITZA CASTILLO, <br><br> Defendants. | CASE NO. _____ |

**VERIFICATION OF COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

I, Dr. Christy Valentine Theard, hereby declare as follows:

1.      I am the Plan President for Elevance Health Companies, Inc. ("Elevance Health") Medicaid and Medicare in New York. I am authorized to make this Verification on behalf of Plaintiff Elevance Health, Inc.

2.      I have read the foregoing Verified Complaint for Injunctive and Other Relief ("Complaint") filed in the above-captioned action, and I am familiar with the facts and circumstances set forth therein.

3.      The factual allegations contained in the Complaint are true and correct to the best of my knowledge, information, and belief.  To the extent any allegations are made upon information and belief, I believe them to be true.

4. I declare, verify, and certify under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Dated: July 23, 2026

_____
Dr. Christy Valentine Theard
Plan President for Elevance Health Medicaid and
Medicare in New York